## COHN *v.* STATE OF INDIANA.

[No. 26,487. Filed May 15, 1935.]

*Frank C. Dailey, James W. Noel, Alan W. Boyd,* and *Paul Y. Davis,* for appellant.

*Philip Lutz, Jr.,* Attorney-General, and *Joseph P. Mc-Namara,* Deputy Attorney-General, for appellee.

FANSLER, C. J.—Appellant, a vice-president of the Meyer-Kiser Bank, was indicted with Sol S. Meyer, president, and Ferd S. Meyer and Julian J. Kiser, vice-presidents, charged with unlawfully and feloniously appropriating to the use of one Albert Blue, and knowingly, feloniously, and unlawfully permitting Albert Blue to receive, the sum of $37.50 in money, which was the property of said bank. There was a trial by jury, and the defendant was found guilty.

Among the many errors assigned at least two question the sufficiency of the evidence to sustain the verdict. In determining whether there is evidence sufficient to sustain a verdict of guilty in a criminal case, this court will consider only that evidence which is most favorable to the state, and the inferences reasonably to be drawn therefrom, and if there

is evidence or reasonable inference to establish all of the material facts necessary to a conviction the judgment will not be disturbed.

It appears that the persons indicted were the active managing officers, and, with two others who were not active, constituted the board of directors of six who managed the affairs of the bank and its predecessor, and that the stockholders of the bank consisted entirely of the persons indicted and their family connections. The bank had for many years operated an investment department, engaged in the purchase and sale of securities, with regular customers throughout the State of Indiana. Through this investment department the bank had underwritten and sold the entire preferred stock issue of more than one hundred realty corporations. Appellant was active in the management of this realty department, the business of which was, however, well known to the other officers of the bank. It was customary when such preferred stock issues were written to provide by contract that the bank should be designated as registrar, and that all monies for dividend payments and maturities should be paid to the bank which should act as fiscal agent in making disbursements. Obviously this procedure led to the deposit of funds with the bank, and furnished opportunity for acquiring valuable deposit balances. The bank profited by the resale of these securities and attached value to its clientele. It appears that, pursuant to a policy of maintaining the good will of its customers, it frequently advanced money for the payment of dividends when deposits were inadequate, in such instances sending its checks stamped "in lieu of dividends." In such cases, before making the disbursement, the cashier consulted with either the appellant or the president, and when the disbursements were made charged the same against the company on

the books of the bank in a manner equivalent to that in which over-drafts are carried against a customer. The indictment is based upon a check for the payment of a preferred stock dividend of the Frailich Realty Company, and the payment made upon the credit of that company.

The Frailich Realty Company was organized in 1926 for the purpose of building, owning, and operating an apartment building in Indiana Harbor. The preferred stock was underwritten by the bank, and resold apparently at a profit of several thousand dollars. Payment of the preferred stock dividends was guaranteed by organizers of the company individually. The issue amounted to $90,000, and the property seems to have been appraised at $140,000. The net earnings of the property were considerably in excess of dividend requirements. In January, 1928, the property was damaged by an explosion and fire which rendered part of the building untenantable. A controversy arose between the owners of the common stock and the insurance companies, which delayed settlements and the repair of the building. The bank had advanced funds for the payment of insurance premiums, and, on the basis of this claim, brought an action which resulted in the appointment of a receiver for the property. At the time the receiver was appointed there was no claim that the company was insolvent or threatened with insolvency. There were no encumbrances or liens except an asserted mechanic's lien which was disputed. There were no admitted creditors except the bank, whose advancements for insurance had amounted to approximately $500.00. The receiver immediately petitioned the court for authority to issue receiver's certificates for approximately $18,000 with which to repair the building. He represented in his petition to the court that certain

liens were claimed against the building which were in his opinion invalid. The bank purchased the receiver's certificates amounting to $17,690. The building was gradually restored and rentals gradually increased. The income was impaired after the fire, and the bank advanced funds for the payment of preferred stock dividends in the manner before indicated. The receiver made a settlement with the insurance companies for something less than the cost of the repairs, and paid the receiver's certificates, the deficit being supplied by rentals received. On June 1, 1929, the bank had advanced approximately $8,000 for dividends. The receiver had accumulated a substantial balance from net earnings, which were steadily increasing. The bank and its officers, including appellant, had been advised, and the receiver agreed, that these funds were available for the purpose of paying the bank's advancements, the only question being as to time of payment in view of the pending litigation concerning the mechanic's liens. On June 4, 1929, the receiver made a payment to the bank of more than $4,000 to apply upon advancements, and an additional $1,000 in August. These payments were made without court order. In September, 1929, attorneys advised that payment for dividends advanced should not be made to the bank until the lien claims were disposed of, although they advised that such claims were in their opinion invalid. It was agreed that the receiver should continue his deposits with the bank, but that they should be held intact in the receiver's account until the liens were disposed of, after which they would be applied to reimbursing the bank for dividends advanced. This arrangement was discussed informally with the judge of the court in which the receivership was pending, and approved. Pursuant to this arrangement, the funds paid to the bank by the receiver were

credited back, and the receiver continued to make deposits aggregating an addition of several thousand dollars prior to September 1st. The bank, continuing its policy of making advancements, paid the quarterly dividends to September 1, 1930, one of which payments is the basis of the indictment. The total balance to the receiver's credit, which appellant and the bank believed available for reimbursing the bank for advancements, amounted to over $9,000 on September 1st, at which time the rentals were in excess of current dividend requirements. The bank also advanced two items of $4,000 each to take up preferred stock maturities. These advancements were charged against the realty company on the bank's books until December, 1930, when the bank took over the preferred stock as its own asset and credited the company with the amount. Shortly thereafter facts developed concerning the mechanic's liens which prompted a settlement, which, including the costs of litigation, amounted to almost $10,000. This apparently exhausted the receiver's balance, and the bank discontinued furnishing advancements, although the receiver made one additional deposit of $1,000 in January, 1931, after which depression conditions so depleted the rental income that no further deposits were made. The bank closed in May, 1931, at which time the balance of something more than $1,000 in the realty company construction account was applied upon the indebtedness to the bank. There is no evidence that any officer of the bank had any financial interest in the realty company, or in paying money to Albert Blue, otherwise than as an advancement upon the credit of the assets of the realty company. At the time of the trial the receiver was still operating the realty company's building, and there was no evidence that upon a return of normal business conditions in Lake County the rentals would be insufficient

to ultimately pay the indebtedness to the bank, or that the corporation owed any debts or obligations other than those which might be incidental to the operation of the building with depleted rentals.

This rather extended statement of the facts is set out as a basis for consideration of the question of whether the appellant had a criminal intention and acted wrongfully and feloniously with the purpose of defrauding the bank and unlawfully misappropriating its money to the benefit of another.

It must be remembered that appellant is charged with an intention of defrauding the bank of which he and his co-defendants were the officers, and themselves and their kinsmen the sole owners, and that, so far as he intended injury, it was to the bank; that at that time the bank was a going concern, with a capital and surplus of many hundreds of thousands of dollars; that the loss, if any, was primarily the loss of the bank; that before any depositor could lose by reason of the advancement the entire capital and surplus of the bank and a 100 per cent assessment upon its stockholders, including the defendants, must be exhausted. Thus, in order to find that the defendants acted with a criminal intent, it is necessary to find in effect that they made the payments with intent to defraud themselves and their associates.

It is contended by the state that the advancement was not a loan to the corporation, since there was no express contract, and that it was not an advancement to the receiver, since the receiver had no power to contract for an advancement, and that the bank could not successfully maintain an action against either the receiver or the corporation for reimbursement of the funds advanced; that therefore the advancement was illegal; that the fact that a transfer of funds was made from the receivership account, in payment of part of the ad-

vancements, and afterwards returned to the receivership account, is evidence of concealment, and that from this evidence of concealment, and the fact that an action might not be maintained to recover the funds, the jury had the right to infer felonious intent in advancing the money. It is conceded by the state that this is a technical theory, and that the prosecution is a technical prosecution.

There was no evidence of concealment. The receiver mailed a check to the bank, which was the basis of the transfer of the funds, believing that he had a right to do so. When it was afterwards suggested by attorneys that the funds should be kept intact in the receiver's account he communicated that fact to the bank by letter. His account was again credited with the fund, and a deposit slip was sent him. The entire transaction was handled openly upon the records, with the full knowledge and acquiescence of all of the officers and all of the active directors of the bank.

We are not prepared to say that the advancement was not a loan to the corporation, which might be recovered from the receiver or the corporation itself, but that is not material. Neither are we prepared to say that the action of the officers in advancing the money to pay the dividends was *ultra vires*. The officers of banks have power to spend money for various purposes. If the transaction was a loan, it was clearly within their powers. They have power to expend money for advertising, for banking house and fixtures, and for other things, the basic purpose of which is to create good will, to attract and retain patrons. As pointed out, this bank was engaged extensively in the business of selling securities to its customers at a profit to itself. It had an interest in encouraging the prompt payment of interest upon these securities, so that its

customers would be satisfied and purchase again to the further profit of the bank. Whether the officers of a bank would be justified in paying reasonable amounts of defaulted interest for the sole purpose of maintaining the good will of customers, and without promise or prospect of recovery of the funds, is a question we need not decide. But in this case it is clear that the officers of the bank expected reimbursement from specific funds, which would apparently soon be available, and were advised by attorneys that the particular funds could be so applied, and by a receiver that he was willing to so apply them. In determining whether the officers and employees of a bank are guilty of crime in dealing with the bank's funds, there is no other rule than that which is applied to the affairs of any other business corporations. If an officer or employee of a corporation exceeds his authority, and the funds of the corporation are lost, he may be civilly liable, but, unless he acts from a dishonest motive, he is not guilty of a crime. Criminal intent in embezzlement is not based on technical mistakes as to the legal effect of a transaction honestly entered into, or nice distinctions in weighing the authority of the officers involved. There can be no embezzlement if the mind of the person doing the act is innocent. There can be no embezzlement without a wrongful purpose.

The law requires that the defendant be presumed innocent of criminal intention until the contrary appears from the evidence. There is evidence that the ██ money was advanced to pay the dividend upon the expectation that it would be repaid, and in the belief that good will would be conserved, and the interest of the bank advanced, by the payment. In other words, there is evidence that the advancements were made in good faith, for a purpose believed to be entirely proper

and within the power and authority of the officers. There is no evidence to the contrary, and therefore no evidence to overcome the presumption against criminal intention.

It is inconceivable that appellant and his codefendants would ever have been indicted on account of this transaction if their bank had not afterwards become insolvent, resulting in a loss to stockholders. We are led to the conclusion that the jury must have reached its verdict of guilt under the misapprehension that some question of defrauding depositors is involved, but this is not true. There is some suggestion in argument or brief that bank deposits are held in trust, and that there is here involved some breach of trust. But bank deposits are not held in trust. The bank bears the relationship of debtor to its depositors. The depositor is the creditor of the bank. No question of the misappropriation of trust funds is involved.

It is possibly true that depositors in banks have lost their savings because of misappropriation and embezzlement of the bank's funds by its officers and employees; in ordinary language, through the dishonesty of officers who have stolen some or all of the bank's assets. Such officers and employees of such banks should be, and no doubt have been or will be, indicted and punished for their wrongdoing. But it is doubtless also true that other banks, honestly managed, with a reasonable degree of skill and business judgment, have become insolvent because of the financial crisis that was unanticipated by at least a large minority, if not majority, of business men; and other banks, still, which through honest but incapable management, have failed and brought ruin to their officers and stockholders, as well as great loss to their depositors. Honest officers and employees should not, and can not under our laws,

be punished as criminals because of mistakes in business judgment or lack of financial ability in the face of an unexpected crisis.

The defendant did but what it was customary to do in the ordinary course of business, when there was no question of insolvency, when his bank was prosperous, and had large earnings and surpluses. He was doing, in fact, only what the responsible management of the bank, which speaks for the bank, desired and intended that he do, in good faith, believing that it was entirely proper and to the best interests of the bank. From the standpoint of the bank, whose funds he is charged with having embezzled, he was acting as a loyal and trustworthy agent, conforming to its wishes and desires. Such are not embezzlers.

It is conceded by the state that to be consistent it must contend that the first time an officer of this bank paid out funds in lieu of dividends upon the preferred stock of any corporation for which it was fiscal agent, in anticipation of deposits from the corporation for the payment of the dividends, its officers were guilty of embezzling the funds of the bank. And yet everyone will realize that no officer or agent or stockholder or representative of the bank would ever advance such a claim; that, on the other hand, in making such payments, the officers were seeking to advance the interests of the bank by maintaining the reputation of the stocks which it sold at a profit to its customers, so that they would again become customers for securities to the profit of the bank; and that the advancements were made with no thought that they would result in loss to the bank, but with the honest expectation, in this case upon advice of attorneys, that funds were, or presently would be, available for reimbursement.

Many questions are presented by the assignment of

errors, which are answered by what we have already said without taking them up in detail. Other questions are not likely to arise again, and we find no necessity for discussing them.

For error of the court in overruling appellant's request for a directed verdict, and for insufficiency of the evidence to sustain the verdict and judgment, the cause is reversed.